(No. 89-CC-0775-)

CHARLOTTE DUPREY, Claimant, v. THE STATE OF ILLINOIS, Respondent.

*Opinion filed September 30, 1994.*

LOWENSTEIN, HUBBARD, SMITH & KAGAWA (CARLTON M. KAGAWA, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (CAROL J. BARLOW, Assistant Attorney General, of counsel), for Respondent.

## OPINION

SOMMER, C.J.

The Claimant seeks damages from the State of Illinois for injuries she received as a result of the State's negligence in maintaining a guardrail on a bridge. The guardrail toppled over when the Claimant's vehicle collided with the rail; and the Claimant's vehicle fell into a river.

On November 23, 1986, at approximately 1:00 a.m., the Claimant, returning from a birthday party in Hegeler, Illinois, was driving her car north on Vermilion County

Road 680, one mile east of Georgetown, approaching the East Bridge, which was maintained by the State. The Claimant testified that it was raining hard. As she rounded a curve and approached the bridge at about 30 m.p.h., she saw two dogs run in front of her. She further testified that she swerved and slightly braked her car to avoid the dogs. She then lost control of her car, and it collided with the south guardrail of the bridge. The car then was deflected across the bridge into the north guardrail. Upon impact, the north guardrail toppled over the side of the bridge. The car then went off the north side of the bridge, hitting its rear bumper and landing upside down in the river 28 feet below.

The first officers at the scene were Georgetown officer Estes and Ridgefarm officer Rouse. The reporting officer, deputy Kevin Rollins, of the Vermilion County Sheriff's Department, arrived at approximately 1:30 a.m. When deputy Rollins arrived, he immediately went to the car, finding officer Rouse propping the Claimant's head out of the water to let her breathe. The officers waited for the ambulance before moving the Claimant. Deputy Rollins testified he observed the smell of alcoholic beverage within the passenger compartment and on the Claimant. He marked the police report under apparent physical condition, "Had Been Drinking." It is noted that the medical bills indicate a blood alcohol level test was administered at the hospital, but the record is silent as to any result of this test. In direct testimony, the Claimant denied having had anything alcoholic to drink at the party.

An ambulance took the Claimant to the emergency room at St. Elizabeth's Hospital in Danville. The Claimant was comatose and required placement in a trauma care unit. She was transferred to Burnham Hospital in Champaign, where she remained in a coma until December 23,

1986. Two weeks later the Claimant was transferred to Mercy Hospital for rehabilitation therapy for four weeks. After her release, she continued therapy while living with her daughter until the Claimant's financial situation made the therapy impossible. Currently the Claimant lives with her brother in a trailer provided for her by her daughter.

The Claimant's diagnosis after the accident was that she had suffered a closed head injury described as subdural hematoma on the left hemisphere, and probable occipital lobe infarction (stroke of the occipital lobe), third cranial nerve palsy, ptosis of the left eyelid, partial collapsed left lung, and depression. Her daughter, Patty True, described the Claimant as having "a big gash in her head, great big hole in her head."

Upon discharge the Claimant's diagnosis was of anoxic encephalopathy, which means there is a brain injury and brain damage from lack of oxygen. Since the accident, she suffers from long and short term memory loss. She continues to have soreness and discomfort in her right side, as well as droopiness in her left eye. She has difficulty maintaining stability while walking. She is unable to go out on her own. She must rely on others. Otherwise, she testified in November of 1992 that she was able to take care of herself.

Prior to the accident, the Claimant supported herself as a LPN, taking care of VA patients in her home, earning approximately $25,000 to $30,000 per year. She can no longer support herself, and lives on $426/month disability benefits from Social Security. As a 60-year-old woman, the Claimant's life expectancy is 22.4 years.

The Claimant's statements of the accident at the trial were conflicting. She testified at the trial on August 21, 1991, under cross-examination, that she was driving in the

left lane of the two-lane road approaching the bridge. Then under re-direct, she testified she was in the right lane. She said the dogs were on the left side of the road in front of her and that she swerved to the left to avoid them; but later under re-direct, she stated she swerved to the right. The Claimant stated that she does not remember everything about the accident, or much of her life before the accident as a result of the memory loss she has suffered.

The East Bridge was constructed in 1922; and the guardrail in question was added in 1964. The Claimant called Dr. Robert Mains, a specialist in structural engineering, to testify at trial. Dr. Mains stated his opinion that the guardrail did not meet the American Association of State Highway Officials' (AASHO) standards for 1965. The guidelines state the rail design should withstand a 10,000 pound impact. That would equal a 35 to 37 m.p.h. speed by the Claimant's car. The Claimant's rate of speed was calculated by both Dr. Mains and a reconstruction specialist, Alex Sorton, to be about seven m.p.h. At the seven m.p.h. impact, the railing gave way without shearing or bending the bolts which held it in place. Dr. Mains stated this was evidence that the railing was not properly anchored and was in need of repair.

The bridge maintenance engineer in 1986 was David Sebright. He testified that he, along with a co-inspector, Thomas Kelly, inspected the bridge in February of 1986. The inspection of the railing showed that the concrete curb had deteriorated and that the railing was loose. The railing shook when pushed by hand. He gave the railing a rating of two, meaning it did not meet current acceptable standards. A rating of one would have meant no railing existed. Any railing built in the early 1960s would not meet current standards. The requirement on new construction of bridges is a crash-worthy rail.

The current bridge maintenance engineer is Jerry Gearlock, who testified the bridge was on a five-year replacement plan. The bridge was actually replaced in 1990. Prior to replacement, the bridge was inspected every year. Mr. Gearlock also stated that the purpose of the railing was for delineation and protection of traffic to keep it from running off. He commented on the AASHO guidelines, stating that the guidelines cover designing new bridge rails and reconstruction contracts, but they do not govern maintenance activities.

The Claimant presents as her basis for recovery that the State was negligent in its maintenance of the bridge guardrail and is therefore liable for her injuries. The State proposed two affirmative defenses: the first that the Claimant was the sole proximate cause of her injuries; and the second, in the alternative, the Claimant was comparatively negligent.

In order for the Claimant to recover against the State, she must prove the State owed her a duty, and that duty was breached by a negligent act or omission, and that such negligence was the proximate cause of her injuries. *McCoy v. State* (1975), 37 Ill. Ct. Cl. 182.

The testimony of the bridge maintenance engineer, Mr. Sebright, is evidence that the guardrail and the curbing holding the guardrail were in poor condition. The Claimant has labeled this a dangerous condition, and attempts to prove that because the State had actual knowledge that the railing had received a poor rating nine months before the accident that this is evidence of negligence on the part of the State. To be held liable the State must have actual or constructive notice of a dangerous condition and permit it to exist without warning the traveling public. (*Clark v. State* (1974), 30 Ill. Ct. Cl. 32.) A dangerous condition can mean a condition unfit for the

purpose which it was intended. (*Allen v. State* (1984), 36 Ill. Ct. Cl. 242.) Mr. Gearlock's testimony that the purpose of the rail was for delineation and protection of traffic to keep it from running off suggests that the bridge rail did not fulfill its purpose since the Claimant's motor vehicle was allowed to run off.

The established law is that when a highway or bridge design standard is altered, existing structures built under older design standards do not have to be altered. (*Hodge v. State* (1981), 35 Ill. Ct. Cl. 50.) Put another way, it is not negligence for the Department of Transportation to continue to use old highways and bridges, even if they know their design is not as safe as modern designs.

This Court has ruled that failure to properly maintain older roads and bridges can be negligence on the part of the State. The numerous pothole cases in which this Court has made awards are examples of failures of maintenance. For an example, see *Stills v. State* (1989), 41 Ill. Ct. Cl. 60. This Court also has found that failure to maintain guardrails can be negligence on the part of the State. (*Kolski v. State* (1976), 31 Ill. Ct. Cl. 307; *Keller v. State* (1982), 36 Ill. Ct. Cl. 99.) The above cases involved damaged guardrails that were not repaired by the Department of Transportation. The standard is that liability can only be imposed where a traveler's deviation is foreseeable; and when the deviation can be deemed a normal incident of travel. (*Keller* at 103.) In the claim before us, the bridge was a narrow two-lane curving bridge built in 1922.

We believe that the case of *Michalak v. County of La Salle* (1984, 3rd Dist.), 121 Ill. App. 3d 574, 459 N.E.2d 1131, is instructive in the present claim. In the *Michalak* case, the motorist impaled his automobile on the end of a guardrail protecting a curve. We believe that the statements of the Court in *Michalak* are equally applicable in the present claim.

"° ° ° The guardrail stands as a warning of danger, a guide to the eye in keeping to the roadway, and a barrier of sufficient strength to withstand the ordinary weights and forces to which it is subjected. ° ° ° It is a question of fact whether a guardrail along a highway need be suitable merely as a warning, or might suffice physically to prevent vehicles from running off the highways into places of danger. [Citation.]"

"° ° ° A duty may be owed to a motorist who deviates from the ordinary course of travel if such deviation was reasonably foreseeable. *Hoffman v. Vernon Township* (1981), 97 Ill. App. 3d 721."

"We believe existence of a guardrail at the location in question concedes the foreseeability that motorists would deviate from the ordinary course of travel in the direction of the guardrail. If motorists never deviated from the traveled portion of the highway, then the guardrail itself would not be necessary." 121 Ill. App. 3d at 576.

As the Illinois Supreme Court has stated: "A duty [is] owed where the occurrence involved is reasonably foreseeable." *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 308 N.E.2d 617, 619.

As the Claimant has argued and the *Michalak* case states, the presence of a guardrail concedes the foreseeability of motorists deviating from the ordinary course of travel.

Therefore, we find that the State owed the Claimant a duty, and that duty was to keep the guardrail in reasonably good condition, though not to the AASHO standards on an old bridge. A guardrail that fell into the river under the bridge when struck at seven m.p.h. was not in reasonably good condition. Additionally, the State knew of the condition of the guardrail, and rated it just above having no guardrail at all. We find the condition of the bridge rail to be a particularly egregious example of lack of maintenance. Therefore, we find the State breached its duty to the Claimant. However, this claim has been decided on its facts only and does not lay down a general rule that all old bridge rails must be maintained in a condition greater than required when built or found after some years of aging.

The Claimant had a duty to use due care and to keep her vehicle under control. *Harris v. State* (1986), 38 Ill. Ct. Cl. 176, 178. *Howell v. State* (1959), 23 Ill. Ct. Cl. 141.

The Claimant testified that she could see "not very much," only 20 to 30 feet, ahead of her due to the hard rain. She testified that she was traveling approximately 30 miles per hour when she saw the dogs come onto the road in front of the bridge. The Claimant was traveling 44 feet per second at 30 miles per hour. Yet, she testified that she could see only 20 to 30 feet ahead. A driver is required to adjust his or her speed to that which is reasonable and proper when a special hazard exists due to weather conditions. (625 ILCS 5/11—601.) We find that the Claimant was driving too fast for conditions as she approached the bridge. She had less than a second to react to any sudden hazard that might occur. By putting herself in such a position, the Claimant failed to use due care and keep her vehicle under control.

The fact that the Claimant was confused in her testimony could be resultant from her memory impairment due to her injuries. We attach little weight to this confusion.

Additionally, we note that the reporting officer, Deputy Kevin Rollins, noted the presence of alcohol in the Claimant's automobile and on the Claimant. Even if there is evidence of alcohol having been drunk, a Court may not draw the conclusion that the driver was impaired without corroborating evidence. *Wagner v. Zbonzak* (1982), (2nd Dist.) Ill. App. 3d 268, 443 N.E.2d 1085.

The following discussion took place at the trial:

| Commissioner: | "What you are telling me is there is medical records going in but you're not stipulating that the blood alcohol result whatever it may be is the result and you are waiting for the State to prove it up." |
|---|---|

Mr. Kagawa (Claimant's attorney): "Right"

Commissioner: "Which I expect the State is going to do at some point in this case."

Mr. Rock (Assistant Attorney General): "Exactly"

No blood alcohol level was ever introduced into evidence by the State. Thus, this Court cannot find that the Claimant was impaired by alcohol.

Additionally, no brief was filed by the State, even though one extension of time was granted to do so. The Claimant did file a brief.

The *Michalak* case states that (with the advent of comparative negligence) "* * * courts have been less willing to label an actor's conduct as a remote cause or condition of the injury." (121 Ill. App. 3d at 578.) Thus, we find that the Claimant's driving and the condition of the bridge rail were both proximate causes of the Claimant's injuries.

No party or persons in this entire proceeding pointed out the significance of the fact that the accident in question occurred on November 23, 1986. Modified comparative negligence became the law on November 25, 1986; thus, as the date of the accident is controlling, damages are to be figured on a pure comparative negligence basis.

In apportioning the negligence we find the Claimant's conduct to have been 2/3 of the proximate cause of her injuries.

The Claimant had medical expenses of $59,811.53 which were testified to as being reasonable and necessary by Dr. Richard A. Rak.

The Claimant's injury is clearly permanent and has deprived her of her livelihood (which was not claimed), and her lifestyle. She has had pain and suffering in the past, present, and future. The Claimant is claiming

$100,000 for pain and suffering and permanency. We will award that amount. Therefore, the Claimant's total damages are $159,811.53. After deducting for her negligence, the Claimant's damages are $53,270.51.

The Claimant has requested costs. The State of Illinois is liable for costs only if the statute awarding costs specifically and clearly names the State of Illinois as liable for costs. (*I & D Pharmacy, Inc. v. State* (1984), 37 Ill. Ct. Cl. 37, 42.) The general statute that enables the awarding of costs to Claimants who recover damages does not name the State of Illinois as being subject to the payment of costs. 735 ILCS 5/5—108.

We, therefore, award the Claimant $53,270.51 in full and complete satisfaction of injuries she suffered when her automobile went through a loose bridge rail on the State-maintained East Bridge on Vermilion County Route 680 on November 23, 1986.